**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-06797 |
| | ) |
| HEALTHCARE INFORMATION AND | ) |
| MANAGEMENT SYSTEMS SOCIETY, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |

## AMENDED COMPLAINT

Plaintiff, Federal Insurance Company ("Federal"), by counsel, brings this action against

Healthcare Information and Management Systems Society, Inc. ("HIMSS") and alleges as

follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory judgment pursuant to the Federal Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202, for the purpose of determining an actual controversy

between the parties by construing the rights and legal obligations arising under a contract of

insurance issued by Federal.

2.      Federal seeks a declaration that it need not defend or indemnify its insured,

HIMSS, in connection with: (1) a purported class action complaint filed against HIMSS

captioned *Hatchmed Corp., et al. v. Healthcare Information and Management Systems Society,*

*Inc*. in the United States District Court for the Northern District of Illinois, Case No. 1:20-CV-

03377 (the "Hatchmed Action", attached as "Exhibit A") and (2) a complaint filed against

HIMSS captioned *Novarad Corporation v. Healthcare Information and Management Systems*

*Society, Inc.*, in Circuit Court of Cook County, Illinois, Case No. 2020-CH-04398 (the "Novarad

Action", attached with a notice of removal filed by HIMSS as "Exhibit B", and with the

Hatchmed Action the "Underlying Lawsuits").

## PARTIES

3.      Plaintiff Federal is an insurance company organized and existing under the laws

of the State of Indiana, with its principal place of business in New Jersey.

4.      Defendant HIMSS is an Illinois not-for-profit corporation that maintains its

principal place of business in Cook County, Illinois.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

There is complete diversity of citizenship between Plaintiff and defendant and the amount in

controversy, including the potential costs of both defending and indemnifying HIMSS exceeds

the sum of $75,000, exclusive of interest and costs.

6.      Venue is proper pursuant to 28 U.S.C. § 1391 because HIMSS's principal place of

business is in this judicial district, the Underlying Lawsuits are pending in this judicial district

and many of the acts from which the Underlying Lawsuits originated occurred in the Northern

District of Illinois.

7.      An actual controversy within the meaning of 28 U.S.C. § 2201 exists among the

parties regarding the coverage provided under policies of insurance.

## BACKGROUND INFORMATION

**A.**     **HIMSS's Tradeshow**

8.      HIMSS describes itself as a global advisor and thought leader supporting the

transformation of the health ecosystem through information and technology.

2

9.      In furtherance of its principal business activity, HIMSS organizes and hosts a

tradeshow each year to bring together healthcare industry leaders.  It describes its annual

tradeshow as "known for its world-class educational programming, with hundreds of highly

vetted sessions from industry leaders, renowned keynote speakers … and hands-on

preconference programming."

10.     According to the Hatchmed Action, HIMSS scheduled its 2020 tradeshow to take

place from March 9, 2020 through March 13, 2020 in Orlando, Florida (the "Tradeshow"). In its

complaint, Hatchmed Corp. alleges that the Tradeshow "attracts more than 1,300 diverse

exhibitors…[w]ith thousands of products and services" related to the healthcare field. The

Tradeshow was expected to involve numerous leaders in the healthcare industry from the public

and private sectors. Notable scheduled speakers for the Tradeshow included President Donald J.

Trump.

11.     Upon information and belief, the Tradeshow "is intended to demonstrate products

and services for healthcare information and/or technology professionals" and HIMSS has the

sole and exclusive discretion to determine the eligibility of exhibitors to participate in the

Tradeshow under its exhibitor contracts.

12.     On March 5, 2020, HIMSS announced in a press release that it was cancelling the

Tradeshow due to the COVID-19 pandemic.  The press release referred to a HIMSS20

Cancellation FAQ page for more information about the cancellation.

13.     The HIMSS20 Cancellation FAQ page provides:

**Why did you wait until now to cancel?**

We made every effort to hold the conference as scheduled and coordinated with an
external advisory panel of medical professionals to support evidence-based
decision making. However, the situation was evolving so rapidly that each day
brought a new development. The fast-evolving circumstances, which were outside

3

of anyone's control, made it clear that it would be an unacceptable risk to bring so many thousands of people together.

\* \* \*

**Will exhibitors be refunded for their HIMSS20 booths and sponsorships?**

HIMSS must follow and honor the terms of exhibitor contracts, which include a force majeure clause. As a not-for-profit, and because of its obligations to other parties, HIMSS will honor its partners' rights but, unfortunately, is not in a position to issue cash refunds beyond those provided in our contracts.

\* \* \*

14.    In a March 13, 2020 interview with "Healthcare IT News", a HIMSS media publication, HIMSS CEO Hal Wolf stated that the "HIMSS Global Conference takes 18 months to prepare", and the decision to cancel the Tradeshow was made by assembling "a group of medical advisors … [which] included epidemiologists, people from all over the country" in order to determine the risk of proceeding with the Tradeshow "purely from a medical standpoint[.]" According to Wolf, continuing with the Tradeshow was no longer a "potentially acceptable risk" once HIMSS reviewed revised numbers on infection and death rates for COVID-19 prepared by the Centers for Disease Control and Prevention and the World Health Organization.

15.    Upon information and belief, HIMSS received a letter from Novarad Corporation ("Novarad") on or about March 26, 2020 demanding a refund of a $38,325 exhibitor fee paid by Novarad to HIMSS under a contract for exhibition space at and access to the Tradeshow (the "Novarad Demand Letter", attached as "Exhibit C").

16.    The Novarad Demand Letter alleged that, on March 23, 2020, HIMSS informed Novarad that it would not refund the $38,325 exhibitor fee based on the force majeure clause in its contract. Novarad contended, however, that the force majeure clause does not allow HIMSS to cancel the Tradeshow while refusing to refund the fee paid by Novarad. Novarad asserted that

the force majeure clause was not triggered because, as of the last day of the Tradeshow (March 13, 2020), "there had been no government-mandated shutdowns and no mandated restrictions on gatherings in Orlando—or anywhere, for that matter" and therefore, it was not impossible for HIMSS to have the Tradeshow, but instead it "simply decided not to do so." Novarad also asserted that a provision that "purports to disclaim HIMSS's obligation to refund the fee (or to pay associated damages resulting from a cancellation)," would be void on public policy grounds.

17.     The Novarad Demand Letter contended that, even if the Tradeshow's cancellation was justifiable, HIMSS cannot exercise its business judgment and discretion in a way that allows it to cancel the Tradeshow while also retaining exhibition fees. Novarad alleged that it incurred approximately $100,000 in costs to prepare for the Tradeshow, and asserted that HIMSS should be liable for those expenses as well as the $38,325 exhibitor fee Novarad paid. Nonetheless, the Novarad Demand Letter advised that, for the purpose of a resolution and subject to Federal Rule of Evidence 408, Novarad would accept a refund of the fee to resolve the dispute.

18.     On April 8, 2020, HIMSS announced that it had been working to "offer meaningful financial remedies" to its exhibitors and that it would be providing most exhibitors a 25% credit of amounts spent on the Tradeshow for future tradeshows in 2021 and 2022.

19.     On May 19, 2020, Softworks sent a demand letter to HIMSS CEO Hal Wolf, on behalf of itself and various other exhibitors (the "Softworks Demand Letter", attached as "Exhibit D"). The Softworks Demand Letter alleges that exhibitors were "shocked and angry" that HIMSS decided to "retain 100% of the money paid for exhibition space rental citing Force Majeure[.]" Softworks demanded that HIMSS immediately refund the money paid by exhibitors for the Tradeshow. In addition to Softworks, numerous other exhibitors co-signed the Softworks

Demand Letter including, among others, Arcserve, BioBright, Bookzurman, Bridge Patient Portal, CyberMDX, DocVilla, Dolphin Data Capture, Dolbey Systems and Estone Technology.

20.     According to an article published by Jessica Kim Cohen in "Modern Healthcare", HIMSS CEO Hal Wolf responded to the Softworks Demand Letter on May 27, 2020.

21.     Upon information and belief, HIMSS's May 27, 2020 response to the Softworks Demand Letter stated that: "[i]n the case of a force majeure event such as the present one, the parties agreed exhibitor fees would not be refundable," and that "[t]he non-refund provision of the force majeure clause in our contract reflects the reality that non-profits like HIMSS have fewer financial tools available when a black-swan event like COVID-19 forces a cancellation."

B.     **The Underlying Lawsuits**

22.     This matter arises out of the Underlying Lawsuits filed against HIMSS by Novarad individually on June 1, 2020 and by Hatchmed Corp. ("Hatchmed") on behalf of itself and a putative class of similarly situated others on June 8, 2020.

23.     The Underlying Lawsuits allege that Novarad, Hatchmed and putative class members executed contracts with HIMSS, which required HIMSS to provide access and floor space at the Tradeshow in consideration of payments made by Novarad, Hatchmed and the putative class members, but HIMSS wrongfully retained these payments after cancelling the Tradeshow in March 2020. As stated in HIMSS's notice of removal in the Novarad Action, "the complaints in both cases allege, inter alia, that HIMSS breached its contract with each of the plaintiffs by cancelling a global healthcare conference…due to the COVID-19 pandemic but retaining payments each of the plaintiffs had made[.]"

24.     The Novarad Action alleges that Novarad and HIMSS are parties to a contract dated January 31, 2019 and entitled "HIMSS20 Exhibit Space & Specialty Pavilion Agreement"

(the "Novarad Contract" attached as "Exhibit E"), under which Novarad paid $38,325 for exhibition space at, and access to the Tradeshow.

      25.    The Novarad Contract provides, in relevant part:

**ELIGIBILITY**: The Event exhibition is intended to demonstrate products and services for healthcare information and/or technology professionals. HIMSS shall determine Exhibitor's eligibility to participate in the exhibition, in the sole and exclusive discretion of HIMSS. HIMSS may refuse rental of exhibit space to Exhibitor, or remove Exhibitor from the Event exhibition hall, if, in the sole and exclusive discretion of HIMSS, Exhibitor's display of goods or services is not compatible with the character and objectives of the Event exhibition. In the event HIMSS initially deems Exhibitor to be eligible to participate in the Event, but later determines that it is not eligible, then Exhibitors prepaid space rental fees and deposits will be forfeited, in accordance with the "Cancellations" provision above.

*   *   *

**FORCE MAJEURE**: In the event that the performance by HIMSS or the Venue or any part of the exhibit area thereof is unavailable whether for the entire event, or a portion of the event, as a result of fire, flood, tempest, inclement weather, or other such cause or as a result of governmental intervention, malicious damage, acts of God, war, strike, lock-out, labor dispute, riot, terrorist acts, curtailment of transportation, or other cause or agency over which HIMSS has no control, or should HIMSS decide that because of any such cause that it is necessary to cancel, postpone or re-site the event, or reduce the move-in and installation time, exhibition time, or move-out time, HIMSS shall not be liable to refund, indemnify, or reimburse the Exhibitor in respect of any fees paid, damage or loss, direct or indirect, arising as a result thereof.

      26.    The Novarad Action alleges that HIMSS cancelled the Tradeshow, days before it was scheduled to begin, on March 5, 2020 because of the "impending spread of the COVID-19 novel coronavirus."

      27.    The Novarad Action alleges that HIMSS informed Novarad it would not refund amounts paid under the Novarad Contract based on the contract's force majeure clause. The Novarad Action further alleges that, "[r]egardless of whatever the COVID-19 novel coronavirus would eventually become, as of the date of the Conference's cancellation, as well as of the dates

7

of the Conference's expected opening and closing, the COVID-19 novel coronavirus did not serve as a basis for HIMSS to rely upon the Force Majeure Clause to cancel the Conference."

28.     Novarad alleges that "HIMSS has materially breached the Agreement by cancelling the Conference and failing and refusing to refund Novarad the Fee Payment and to compensate it for other damages."

29.     The Novarad Action sets forth causes of action for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, quantum meruit, and/or quasi-contract.

30.     The Hatchmed Action alleges that pursuant to a contract executed on November 20, 2019, Hatchmed paid $11,075.00 to HIMSS in exchange for access and to exhibit its goods and services at the Tradeshow.

31.     The Hatchmed Action alleges that as many as one thousand members of the putative class entered into similar contracts with HIMSS for Tradeshow access and floorspace, and that the amount in controversy exceeds $5 million.

32.     Hatchmed alleges that HIMSS breached its contracts with each member of the putative class by cancelling the Tradeshow due to the COVID-19 pandemic, but unilaterally retaining payments made under these contracts by members of the alleged putative class for access and exhibition space at the Tradeshow.

33.     The Hatchmed Action seeks class certification on the basis that certain common questions of law exist, including: (1) whether HIMSS breached its contracts to provide access to the Tradeshow by cancelling the Tradeshow and refusing to issue refunds; (2) whether HIMSS complied with its obligations under the contracts; and (3) whether HIMSS has any valid legal defense for this conduct.

34.     The Hatchmed Action asserts causes of action for breach of contract, unjust enrichment, and promissory estoppel.

35.     Hatchmed alleges that it and the putative class members were wrongfully deprived of amounts paid to HIMSS and in the absence of the Hatchmed Action, HIMSS would retain the benefits of this wrongdoing.

**C.     The Policy**

36.     Federal issued ForeFront Portfolio (For Not-for-Profit Organizations) Policy No. 6803-0243 (the "Policy", attached as "Exhibit F"), effective for the period October 1, 2019 through October 1, 2020, which was extended by endorsement to October 31, 2020 (the "Policy Period"), to HIMSS, the Named Insured. The Policy's Directors & Officers and Entity Liability Coverage Part (the "D&O Coverage Part") has a $10,000,000 aggregate limit of liability subject to a $25,000 Retention under Insuring Clause 3.

**D.     The Notifications of the Underlying Lawsuits Under the Policy**

37.     On June 23, 2020, HIMSS provided notice of the Hatchmed Action under the Policy via email correspondence from its insurance broker to Federal. In the email chain providing this notification, HIMSS advised it "would like to retain Latham & Watkins as they are handling the underlying insurance claim."

38.     In a July 31, 2020 article published by Susan Morse in "Healthcare Finance", a publication of HIMSS Media, it was reported that HIMSS CEO Hal Wolf stated that "[w]hen the cancellation took place (for) HIMSS20, the contractual environment limited us to how we could respond" to exhibitors. Wolf further stated that the "insurance process" limited HIMSS's response and that "[t]hose negotiations are ongoing." Wolf further stated that it is HIMSS's "intent, once we are resolved on our [insurance] claim…to come forward with additional

remedies at that time[.]" Wolf further advised that HIMSS's "contract stipulates all costs and fees are held by HIMSS but the company turned around and gave exhibitors a 25% credit for HIMSS21 and HIMSS22, by applying 15% to HIMSS21 and 10% to HIMSS22" resulting in HIMSS spending "over $7 million out-of-pocket."

39.     By letter dated August 7, 2020, Federal denied that it owes a duty to defend or indemnify HIMSS for the Hatchmed Action under the Policy. This letter advised that "[i]f you disagree with the declination of coverage set forth in this letter, then Chubb asks that you advise it of the reasons for any such disagreement within 30 days. If there is a dispute as to coverage, including any duty to defend, to preserve coverage defenses under applicable law, Chubb may need to file an action for declaratory judgment."

40.     On September 24, 2020, Federal sent a follow-up letter to HIMSS asking that it advise whether HIMSS disagreed with Federal's denial of coverage under the Policy and requesting that HIMSS enter into an enclosed non-waiver agreement if it disagreed with Federal's coverage position in order to obviate the need for coverage litigation.

41.     By email correspondence dated November 3, 2020, HIMSS provided notice of the Hatchmed Action under two additional policies issued by Federal and another Chubb company, Great Northern Insurance Company.  HIMSS has since confirmed that it does not seek coverage for the Underlying Lawsuits under those additional policies.  The November 3, 2020 email described the Underlying Lawsuits as follows: "[p]laintiff's sued defendant for its unilateral decision to keep all of the money paid by defendants to plaintiff for tradeshows which have been cancelled."  This notification listed HIMSS General Counsel Ilene Wolf Moore as the point of contact for insurance purposes.  HIMSS did not, however, respond or otherwise address Federal's August 7, 2020 or September 24, 2020 letters.

42.     On November 5, 2020, Federal sent another letter to HIMSS asking whether it disagreed with Federal's coverage position under the Policy, and requesting that HIMSS consider entering into the previously provided non-waiver agreement if it disagreed with Federal's coverage position to obviate the need for coverage litigation.

43.     By letter dated November 10, 2020, HIMSS's outside counsel, Latham & Watkins, responded to Federal's August 7, 2020 letter denying coverage under the Policy. Latham & Watkins advised that HIMSS disputes Federal's coverage position and demanded that Federal withdraw its denial of coverage and provide coverage under the Policy for the Hatchmed Action. This letter did not respond to Federal's request that HIMSS consider entering into a non-waiver agreement in order to obviate the need for coverage litigation.

44.     On November 16, 2020, Federal filed its initial complaint in the instant action for declaratory relief that no coverage was available under the Policy (the "Coverage Action").

45.     According to filings in the Underlying Lawsuits, on November 17, 2020, the parties in the Hatchmed Action attended a mediation session with the Honorable Wayne R. Andersen (Ret.).

46.     On November 18, 2020, after Federal had commenced the Coverage Action, HIMSS provided notice to Federal of the Novarad Action under the Policy. This notification also listed HIMSS General Counsel Ilene Wolf Moore as the point of contact for insurance purposes.

47.     On January 11, 2021, the parties in the Hatchmed Action filed a "Notice of Settlement and Joint Motion to Stay Case Deadlines" advising the court that "[t]he parties now report that they have reached an agreement in principle subject to reaching agreement on all remaining terms and preparing a definitive written settlement agreement."

11

48.     By letter dated January 22, 2021, Federal denied that it owes a duty to defend or indemnify HIMSS for the Novarad Action under the Policy.

49.     On January 25, 2021, the parties in the Hatchmed Action reported to the court "that they have drafted a written settlement agreement as well as notice forms, a claim form and a proposed preliminary approval order, which they are now working to finalize."

50.     On January 29, 2021, the parties in the Novarad Action filed a "Joint Motion to Stay Case Deadlines" stating that "[t]he parties now report that they, along with the plaintiff in HatchMed, have reached an agreement in principle, subject to reaching agreement on all remaining terms and preparing a definitive written settlement agreement, for Novarad to join HatchMed Corp. as a Named Plaintiff in HatchMed and representative of the proposed class for purposes of the anticipated settlement in that case."

51.     To date, HIMSS has not filed an answer or otherwise responded to the complaints in either the Novarad Action or the Hatchmed Action.

52.     HIMSS did not notify Federal or otherwise report either the Novarad Demand Letter or the Softworks Demand Letter under the Policy, and has not provided Federal with copies of any correspondence issued in response to those letters.

### COUNT I - DECLARATORY JUDGMENT
### THE POLICY'S PROFESSIONAL SERVICES EXCLUSION
**(Federal Has No Duty to Defend or Indemnify Pursuant to the Professional Services Exclusion)**

53.     Federal reasserts and incorporates by reference Paragraphs 1 through 52 as if fully set forth herein.

54.     Endorsement No. 6 of the Policy's D&O Coverage Part provides that no coverage will be available for "**Loss**" on account of any "**Claim**" based upon, arising from, or in consequence of any actual or alleged error, misstatement, misleading statement, act, omission,

neglect, or breach of duty committed, attempted, or allegedly committed or attempted in connection with the rendering of, or actual or alleged failure to render, any "**Professional Services**" for others by any person or entity otherwise entitled to coverage under the D&O Coverage Section, provided, however, that this exclusion shall not apply to any "**Specific Management Claim**" (the "Professional Services Exclusion").

55.     "**Professional Services**" is defined by Endorsement No. 6 of the D&O Coverage Part to mean "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted or allegedly committed or attempted in connection with the rendering of, or actual or alleged failure to render, any professional services for others by any person or entity otherwise entitled to coverage under this policy."

56.     HIMSS's planning, organization and decision to cancel the Tradeshow constitutes "professional services" as they are business activities involving specialized knowledge, labor and skill, and are predominantly mental or intellectual. HIMSS describes its principal business as "a global advisor and thought leader supporting the transformation of the health ecosystem through information and technology." Specifically, HIMSS states that "[t]hrough our innovation engine, HIMSS delivers key insights, education and engaging events to healthcare providers, governments and market suppliers, ensuring they have the right information at the point of decision." The planning, organization and cancellation of the Tradeshow involved and was in connection with HIMSS's exercise of its business judgment in conducting its principal business activity of educating and providing information to parties in the healthcare industry.

57.     The Underlying Lawsuits are based upon, arising from, or in consequence of any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted in connection with the

13

rendering of, or actual or alleged failure to render, any "**Professional Services.**" Therefore, the

Professional Services Exclusion precludes coverage for the Underlying Lawsuits, and Federal

has no duty to defend or indemnify HIMSS under the Policy.

58.     An actual controversy exists between Federal and HIMSS with respect to

Federal's obligations under the Policy in connection with the Underlying Lawsuits as HIMSS

continues to tender this matter for coverage. Accordingly, the Court's declaration of the parties'

rights and obligations is required to resolve the controversy.

**WHEREFORE**, Federal requests a judgment against HIMSS as follows:

i.      Declare that the Professional Services Exclusion applies to the Underlying Lawsuits and the Policy does not cover any loss, expense, or other relief arising out of, or in any way related to the Underlying Lawsuits;

ii.     Declare Federal owes no duty to defend or indemnify HIMSS for the Underlying Lawsuits under the Policy; and

iii.    Award Federal any other relief that this Court deems just and appropriate.

### COUNT II - DECLARATORY JUDGMENT
### THE POLICY'S CONTRACT EXCLUSION
**(Federal Has No Duty to Indemnify Pursuant to the Contract Exclusion)**

59.     Federal reasserts and incorporates by reference Paragraphs 1 through 58 as if fully

set forth herein.

60.     Subsection 6 of the Policy's D&O Coverage Part provides that Federal shall not

be liable under Insuring Clause 3 for "**Loss**," other than "**Defense Costs**," on account of any

"**Claim**" based upon, arising from, or in consequence of any actual or alleged liability of an

**Organization** under any written or oral contract or agreement, provided that this exclusion shall

not apply to the extent that the **Organization** would have been liable in the absence of such

contract or agreement (the "Contract Exclusion").

61.     The plaintiffs' claims in the Underlying Lawsuits are based upon, arise from and are in consequence of HIMSS's contracts with its customers and HIMSS's invocation of force majeure provisions to deny refunds under such contracts.

62.     The Underlying Lawsuits are based upon, arising from, or in consequence of the actual or alleged liability of HIMSS under written or oral contracts or agreements, and HIMSS would not have any liability in the absence of such contracts or agreements. Therefore, Federal has no duty to indemnify HIMSS under the Policy.

63.     An actual controversy exists between Federal and HIMSS with respect to Federal's obligations under the Policy in connection with the Underlying Lawsuits as HIMSS continues to tender these matters for coverage. Accordingly, the Court's declaration of the parties' rights and obligations is required to resolve the controversy.

**WHEREFORE**, Federal requests a judgment against HIMSS as follows:

    i.    Declare that the Contract Exclusion applies to the Underlying Lawsuits and the Policy does not cover any settlement, judgment, award, or other relief arising out of, or in any way related to the Underlying Lawsuits;

    ii.    Declare that Federal has no obligation to indemnify HIMSS in connection with the Underlying Lawsuits under the Policy;

    iii.    Award Federal any other relief that this Court deems just and appropriate.

## COUNT III - DECLARATORY JUDGMENT
### THE POLICY'S DEFINITION OF "LOSS"
**(Federal Has No Duty to Indemnify HIMSS's Repayment of Wrongfully Retained Funds or Other Uninsurable Amounts)**

64.     Federal reasserts and incorporates by reference Paragraphs 1 through 63 as if fully set forth herein.

65.     Insuring Clause 3 of the Policy's D&O Coverage Part obligates Federal to pay, subject to the Policy's other terms and conditions, "**Loss**" which HIMSS becomes legally

obligated to pay on account of any "**Claim**" for a "**Wrongful Act**" and provides that Federal will have the duty to defend HIMSS against any "**Claim**" covered by the D&O Coverage Part. The Policy's "**Loss**" definition includes amounts that HIMSS is legally obligated to pay on account of a "**Claim**", but does not include, among other things, amounts that are uninsurable under applicable law. Federal has no obligation under the D&O Coverage Section, to pay for amounts which do not constitute "**Loss**" as defined in the Policy.

66.     The Underlying Lawsuits do not seek "**Loss**" as defined by the Policy's D&O Coverage Part. Instead, the Underlying Lawsuits seek the return of amounts paid to HIMSS pursuant to various contracts, and which HIMSS allegedly improperly retained after it failed to perform under the contracts. As the Underlying Lawsuits seek the return of ill-gotten gain, which is uninsurable under the law, the **Claim** does not seek "**Loss**" as that term is defined by the Policy's D&O Coverage Part.

67.     Additionally, the Underlying Lawsuits seek the return of amounts paid to HIMSS pursuant to contracts, or damages resulting from such retention, as a result of HIMSS's failure to perform under its contracts. Payments required for voluntarily undertaken contractual obligations are not amounts which HIMSS is "legally obligated" to pay and do not constitute "**Loss**" under the Policy's D&O Coverage Section.

68.     The Underlying Lawsuits seek the return of ill-gotten gain or amounts which are otherwise uninsurable, and for which HIMSS is not legally obligated to pay, and such amounts do not constitute a "**Loss**" under the Policy. Therefore, Federal has no duty to indemnify HIMSS under the Policy for the Underlying Lawsuits.

69.     An actual controversy exists between Federal and HIMSS with respect to Federal's obligations under the Policy in connection with the Underlying Lawsuits as HIMSS

continues to tender these matters for coverage. Accordingly, the Court's declaration of the

parties' rights and obligations is required to resolve the controversy.

**WHEREFORE**, Federal requests a judgment against HIMSS as follows:

i.      Declare that the Underlying Lawsuits seek amounts that are not a "**Loss**" under the Policy, and coverage is not available under the Policy for a settlement or judgment in the Underlying Lawsuits;

ii.     Declare Federal has no obligation to indemnify HIMSS in connection with the Underlying Lawsuits under the Policy; and

iii.    Award Federal any other relief that this Court deems just and appropriate.

## <u>RESERVATION OF RIGHTS</u>

70.     The Policy contains other terms, conditions, and exclusions that may be relevant

to the Underlying Lawsuits. Nothing in this complaint should be construed as a waiver by

Federal of any coverage defenses under the Policy. Federal continues to reserve the right to raise

all other terms, conditions, and exclusions as defenses to coverage for any claim made under the

Policy, or any other policy issued by Federal where appropriate.

Dated: February 16, 2021                              Respectfully submitted,

                                                      By: /s/ Matthew Dostal____
                                                          *Counsel for Federal*

                                                          Matthew Dostal (Bar No. 6312695)
                                                          Clyde & Co US LLP
                                                          55 West Monroe Street
                                                          Suite 3000
                                                          Chicago, IL 60603
                                                          (312) 635-7000

                                                          Edward J. Kirk (*pro hac vice*)
                                                          Jason M. Balsamo (*pro hac vice*)
                                                          405 Lexington Avenue, Floor 16
                                                          New York, NY 10174
                                                          Telephone: (212) 710-3900

## CERTIFICATE OF SERVICE

I, Matthew Dostal, certify that on February 16, 2021, a true and correct copy of the

foregoing AMENDED COMPLAINT was filed through the CM/ECF system, which caused notice

to be sent to all counsel of record.


Dated: February 16, 2021

/s/ *Matthew Dostal*
One of the Attorneys for Plaintiff
Federal Insurance Company

Matthew Dostal
Clyde & Co US LLP
55 West Monroe Street
Suite 3000
Chicago, IL 60603
(312) 635-7000

18